Opinion filed December 22,
2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-10-00196-CR 

                                                    __________

 

                           MANUEL
LOUIS ROBINSON, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 54th District Court

 

                                                        McLennan
County, Texas

 

                                                Trial
Court Cause No. 2009-528-C2 

 



 

                                            M
E M O R A N D U M   O P I N I O N

            Manuel Louis Robinson appeals his conviction and sentence for
capital murder.  In four issues, appellant contends that the evidence was
insufficient to prove that the murder was committed in the course of committing
or attempting to commit a robbery, that the evidence was insufficient to
establish that appellant intended to cause the death of the victim, that the
submission of an erroneous instruction in the charge caused appellant egregious
harm, and that the trial court’s order that appellant repay the costs of
appointed counsel was error.  The State agrees that the judgment should be
modified to delete the assessment of those costs.  We modify the judgment to
delete the assessment of costs of counsel.  As modified, we affirm.

Background
Facts

            Lupe
White, the victim’s wife, testified that she, the victim, and their son were
watching a movie late in the evening of June 1, 2008.  She fell asleep, but
gunshots woke her.  The lights were off, although they had been on when she
went to sleep.  Her son, Jameson, was shouting at her, sounding scared.  She
ran into him in the dark, and when she went out in the backyard, she saw
someone dressed in black jumping over the fence.  She also saw a charcoal gray
car pulling out of the alley.  She tripped over the victim’s body at a back
corner of their house.

            Jameson testified that he was watching the movie but that his
father sent him to bed.  Shortly after he went into his room, the lights went
off.  The house was old, the breaker box was at the back of the house, and the
lights often went off.  Jameson used his Gameboy as a light so that his dad
could see the fuse box.  Usually, it was a fuse that went out; however, his
father opened the box and said that the lever had been pulled.  The lever had
never been the problem, and his dad sent him inside for a flashlight.  As he
returned to the back door and looked through the screen, he heard gunshots and
saw flashes of light from a semiautomatic weapon.  Jameson said that he stayed
inside and that Lupe came up behind him.  He saw a man wearing dark clothes,
who appeared to be African-American, running toward the alley.  Jameson saw the
man put his hands on the fence.  They were black, but he acknowledged that the
man could have been wearing gloves.  Jameson also heard a car leave the alley
and said that his mother found his dad at the left back corner of the house.

            In describing
the backyard area, Jameson said that a band room and beauty shop at the back of
the property could be seen when one walks out on their back porch.  The garage
was between the back porch and the band room.

            Doreen
Mishele Walker lived next door and was watching a movie when she heard about
five rapid-fire gunshots.  She then heard Lupe’s voice asking her to call 911,
which she did.  The victim’s body was only about twenty feet from Walker’s
window.  She commented that the alley was wide enough for a large car.

            Officer
Kenneth Carpenter and Officer Timothy James Bonovitch of the Waco Police
Department were the first officers to arrive at the victim’s house.  Officer
Carpenter said that they found several .223 cartridge casings, a .45 casing,
and some blood spots at the scene.  Based on Officer Carpenter’s military
training, he knew that a .223 cartridge is used in the AR15.  The officers
found a buffer spring and part of a butt stock from an AR15, and Officer
Carpenter explained that it would take a lot of force to break these parts
off.  Officer Carpenter testified that the .223 casings and the AR15 parts were
found approximately four or five feet from where the victim lay.  The .45
casing was found near a tree, approximately twenty feet from the victim.   Blood
spots were on the sidewalk in front of a building and near where the .223
casings and parts to the AR15 were found.

            Doctor
Tracy Dyer, a forensic pathologist with the Dallas County Medical Examiner’s
Office, testified that one gunshot entered the left side of the victim’s chest,
hit a number of vital organs, and then left deformed fragments of the bullet on
the right side of the pelvic area.  The path of the shot was downward.  There
was stippling on the victim’s skin, indicating that the gun was very close to
the victim.  That would have been a fatal wound.  

A
second shot went from front to back, through the abdomen, and exited the right
side of the back.  A third shot left a superficial wound on the left side of
the victim’s abdomen; it was very sharply downward in its angle.  And a fourth
shot entered the right thigh and came out of the lateral backside of the right
thigh.

            Doctor
Dyer said there also were a number of blunt force injuries to the victim:  a
laceration on the upper left side of his lip; a variety of abrasions on the
forehead, nose, and face; and a bruise on his right ear.  The blunt force
injuries could have resulted from a struggle with his assailant.  There was
also soot on the victim’s left forearm indicating that his arm got in the way
of a gunshot.

            Two
other experts testified.  One confirmed that the residues on the victim and the
ripping and tearing of his clothing around the gunshot holes indicated that the
victim was very near some of the gunshot discharges.  The ripping and tearing
was caused by the gas escaping from the weapon when it was discharged.  The
other forensic expert explained how he determined that all three .223 cartridge
casings were fired from the same weapon.  He also analyzed a fired bullet from
a .45 caliber weapon that had lodged in the corner of the house near the
victim.[1] 
On the night of the murder, the fired .45 casing was found about twenty feet
from the victim.  No matches were found for the .45 caliber casing in the
National Integrated Ballistic Information Network. The rifling of the gun that
fired the bullet did not match anything in the FBI’s Gun Rifling Characteristics
Database.

            Crime
scene investigators also found a number of blood droplets at the crime scene. 
There was a trail of blood droplets toward the back fence that indicated the
person who left them was moving in a northerly direction toward the alley.  Blake
Goertz, manager of the DNA section for the Texas Department of Public Safety
Crime Lab in Waco, told the jury that he found that the DNA profiles of some of
the droplets were consistent with the profile of the victim.  DNA profiles of
other droplets found on the concrete and shrubbery were compared with an
offender database called CODIS, and those profiles were found to be consistent
with the DNA profile of Raheem Watkins.  On November 3, 2008, the lab received
a known blood sample from Raheem that confirmed that his profile was consistent
with the profile of the blood droplets found at the crime scene.

            Marquita
Lee Pordia is appellant’s sister.  At the outset of her testimony, she stated
that she absolutely did not want to be a witness.  On the evening of the
murder, Marquita was at her now mother-in-law’s house.  Her husband, Carl Watkins,
is known as Inky, and his mother is referred to as Pudding.  Brittany Hamilton,
appellant, and Raheem also were there.  Brittany was dating appellant, and
Marquita was fairly certain that they had a sexual relationship.  Brittany was
seventeen at the time.

            Late
in the evening, appellant asked Marquita if Brittany could ride with Marquita
because he and Raheem were going to use Brittany’s car to “go dirty legging.” 
Raheem gave Marquita some gas money and some marihuana.  Appellant and Raheem
left in Brittany’s car, which Marquita described as a gold Nissan Altima. 
Brittany, Brittany’s infant son, and Marquita left in Marquita’s car.  Marquita
testified that, while she was at the gas station, she saw Brittany’s car go by,
but did not see who was in the car.  She did not remember telling Detective Steve
January that she had seen her brother and Raheem in the car.  At some point,
Marquita’s car broke down on 16th or 17th Street.

            While
Marquita was waiting there, appellant drove up without Raheem and asked
Brittany to take him home.  Marquita admitted that she told Detective January, when
she came in at Detective January’s request in 2009, that her brother told her
that night that he had “f----d up” and that he was fixing to go.  She also
admitted that she asked him, “Where you fixing to go?”  At trial, she claimed
that she just told Detective January that appellant had made the statement to
her because she was scared and needed to get home to her kids but that appellant
had not made the statement.  She admitted that no one made her come in to talk
with Detective January and that she knew she was free to go at any time.

            Marquita
testified that it was Inky who gave Brittany some pills to take to Raheem at
Jenequehua Scott’s apartment in the Lake Shore North Apartments.  She claimed
that the hydrocodone pills were for Raheem to get high and that her brother had
not told her that Raheem had been shot in the foot that night and needed pills
for pain.  She admitted at trial that she went with Brittany to Jenequehua’s
apartment, but said that she did not go in.

            The
prosecutor then asked her if she had talked to her brother the night before her
trial testimony, but she remembered talking only with Sharon Francis.  The
prosecutor then asked her if appellant (who was in jail) was also on the phone
with them, and she admitted that he was.  She first said that her brother asked
her not to be a witness and then corrected her statement to say that he told
her she did not have to take the stand.  She claimed that her brother had not
told her to run to Dallas; she had told him that she was going to run to Dallas
because she did not want to testify.  The prosecutor reminded her that calls
from the jail were recorded; her testimony then became less evasive.

            Marquita
remembered that appellant came and told her when the police towed Brittany’s
car away.  She “assumed” that event was very important to him for some reason. 
Marquita then testified as follows:

Q. 
Okay.  Now, at that point in time, he told you, Big Sis, I’m gone, y’all ain’t
never going to see me again?

 

A. 
Yes.

 

Q. 
And he told you that, right?

 

A. 
Yes.

 

Q. 
And he started to – you started to cry and you asked him, what’s going on;
didn’t you?

 

A. 
Yes.

 

Q. 
And then he responded, you know what’s going on Big Sis, for Raheem – for what
Raheem is going down for, they fixin’ to come and get me; didn’t he tell you
that?

 

A. 
Yes.

 

Q. 
Okay.  And then you told him, Man [his nickname], you done f----d up, you f----d
up bad, what did you do, what did you and Raheem do, why did you go f--k with
him like that anyway; didn’t you say that?

 

A. 
Yes.

 

Q. 
And then, he said, f--k that, that s--t is over with, I’m gone?

 

A. 
Yes.

 

Q. 
And that was in October of '08 he told you that?

 

A. 
Yeah.

 

            Marquita
claimed that she did not know where appellant went, only that he left Waco
because they were taking Brittany’s car and because he had taken Raheem to a
hospital in Dallas to have his foot treated by a doctor.

            An
officer with the Dallas Police Department, Andrew Palmer, testified that he was
on patrol on February 12, 2009, when he received a dispatch call to go to an
apartment at 6500 South Cockrell Hill Road.  A neighbor had heard people
fighting above him and called in.  Officer Palmer and two other Dallas police
officers went to the address.  When they entered the upstairs apartment, six
people were there.  They could hear a male and female arguing in the bedroom. 
When the couple saw the officers, the male ran into the bathroom.  The man told
them that his name was Stacey Robinson, and the officers arrested him for
possession of marihuana. As a result of his being fingerprinted at the jail,
the officers learned that his name was Manuel Robinson and that there was an
arrest warrant out of Waco for him for murder.

            Brittany
Nicole Hamilton said that she had known Raheem for four or five years and that
she dated appellant for about two months.  She also said that, on the night of
June 1, 2008, she, Raheem, Inky, Marquita, appellant, and Pudding were at
Pudding’s house.  She was smoking marihuana with Marquita and Inky.  Raheem and
appellant were in another room “messing” with a long, black rifle and a silver
and black handgun.  Raheem had the rifle, and appellant had the handgun.  They
were wiping them down with a white rag.  She identified State’s Exhibit No. 118
as a picture of a rifle that looked like the rifle that Raheem had that night.

            She
said that, ultimately, everyone went outside.  An aunt pulled up.  She was
speaking “churchly” to them, and they were trying to hide the gun from her by
sitting in front of the gun. When appellant asked Brittany to go with Marquita,
Brittany went to her car to get her son’s car seat out of the trunk and saw a
box of long, skinny bullets in the trunk.  Her son was about seven months old
at the time.  She did not ask appellant why he wanted her car.  Brittany
testified that appellant and Raheem left first, and then she and Marquita left.

            Marquita
got some gas and drove around, and they ended up at a man named Ernest’s house
on 17th Street where Marquita’s car broke down.  Marquita called appellant, but
there was no answer; she then called her husband, Inky.  Inky showed up and
went to get some gas.  While Inky was gone, appellant drove up in Brittany’s
car; he was alone.  When appellant got out of the car, he looked worried.

            Brittany
asked appellant what was wrong, but he just walked over to his sister. 
Brittany could not hear what Marquita and appellant were saying, but she saw Marquita
start crying and hugging appellant and a “tear roll down his eye.”  When appellant
came over to her, she asked what happened to Raheem.  His answer was “Raheem
was ducked off,” meaning he was hiding.  Appellant said they needed to take
some pills to Raheem for pain because he shot himself in the foot.

            Appellant
located some pills, and they went to Jenequehua Scott’s apartment at the Lake
Shore North Apartments.  When they arrived there, Brittany noticed some blood
on the passenger seat floorboard and saw Raheem’s right shoe on the backseat
floorboard.  The shoe had a hole in it “by the pinky toe.”  When she asked if
it was Raheem’s shoe, appellant just threw the shoe in the dumpster at the
apartment complex.  She also noticed a trail of blood outside and inside
Jenequehua’s apartment.

            After
leaving the apartment, she took appellant to his aunt’s house, and she went to
her grandmother’s home where she lived.  She testified that, when appellant and
Raheem left Pudding’s house, appellant was wearing a black, long sleeve shirt
and a navy or black cap.  When he showed up at 17th Street, he was wearing a
gray T-shirt and some black gym shorts.  When Brittany dropped him off at his
aunt’s, appellant took the clothes he had worn earlier that night from the
trunk of her car.

            The
next time she was with appellant and Raheem, Raheem said that he had to see
someone about his foot.  They took Brittany’s car, but she insisted that she go
with them because she could tell something was wrong but did not know what was
wrong, only that there was blood in her car.  During the drive to Dallas, appellant
used her phone to call someone.  He asked that person about a hospital in
Dallas and “a park that was where a lot of stuff went on, shootings, or
whatever, so that Raheem would have something to tell the police once he got to
the hospital.”  Brittany testified that Raheem and appellant decided that
Raheem would say that he was walking through the park, that he had an
altercation with someone, that they dropped a gun, and that it shot him in the
foot.

            While
Raheem was in the hospital, appellant and Brittany went outside.  When she
asked him what really had happened, appellant told her that he had shot Raheem
in the foot.  He said that they had cut the man’s lights and then waited in the
grass for the man to come outside.  When he did, they struggled over the gun
and that is how Raheem got shot in his foot, “and then eventually the gun went
off and shot the man.”  Brittany said her reaction was that they must have been
trying to rob him.

            Brittany
testified that a week or two before that night, Raheem and appellant were
saying they needed to “hit a lick.”  She explained that meant they needed to go
rob somebody for their money or belongings.  When asked why they went to that
particular house, Brittany said that, once she saw a photo of the house, she remembered
that the three of them had driven by the house twice within a week or two
before the man was shot.  “And they were pointing at a shed believing that he
had money or marijuana or something in it.”

            Brittany
said that, after the conversation at the hospital and reading newspaper
accounts, she became worried that she might be in trouble because they used her
car.  She said appellant assured her that she could not get in trouble because
they parked the car around the corner in the alley; also, the newspaper
articles said the car was silver in color.  Brittany identified a photograph of
her car and described it as being a champagne color, but she stated that at
night it appeared gray in color.  She admitted that the next morning she used
soap and water to clean the blood from her car.

            Brittany
said that Raheem used his real name in Dallas but gave the address of her
grandmother for his address.  Her grandmother threw letters from the hospital
away; however, Brittany picked up Raheem’s mail at her grandmother’s house one
day and threw the letters in the trunk of her car.  They were Raheem’s hospital
records and were introduced as exhibits.  The envelopes confirmed that the
letters were mailed to Raheem at her grandmother’s address and that he had a
wound in his foot.

            Brittany
testified that Detective January came to her grandmother’s house to impound her
car and that she subsequently wrote a statement about what had happened. 
During cross-examination, she said that Jeremy Standifer (who was in federal
prison) would tell her about the street talk concerning that night, but she
told him she did not know anything.  But after her car was impounded, she told
Jeremy what had happened.  Brittany claimed that, at first, she did not know
that Jeremy could use the information to try and help himself, but later, Jeremy
told her that he could.

            Detective
January testified that the first break in the case came when he received a fax
from CODIS that the DNA profile of blood at the scene matched the DNA profile
of Raheem.  He obtained an arrest warrant for Raheem and then, within a week,
obtained a search warrant to obtain Raheem’s DNA for confirmation.  When he saw
Raheem’s right foot, it had gangrene from a large caliber wound between his
last toe and the toe next to it, which matched Brittany’s testimony that it was
near his pinky toe.  He testified that, after talking with Jeremy, he located
Brittany on October 20, 2008, and impounded her Nissan Altima.

            Brittany
came in to see Detective January at 4:00 p.m. that day and told him what she
knew about the case.  He verified her information and obtained an arrest
warrant for appellant the day after he impounded her car.  He found the medical
records for Raheem from the Methodist Charlton Medical Center in Dallas in the
trunk.  Detective January said that Jenequehua also came in for a statement. 
He went to her apartment twice and could see there were discolored patches on
her carpet from the front door to her bedroom.  Jenequehua told him that she
had used a chemical and bleach to remove the blood.  The police were unable to
gather blood DNA from the carpet because of the cleaning.  At that time, it was
some four and one-half months after the murder.

            Detective
January said that he spoke with appellant’s sister, Marquita, two days after impounding
Brittany’s car.  He said that, at that time, Marquita told him several times that
Raheem and appellant left in Brittany’s car first, before she and Brittany left
from Pudding’s house that night.  Detective January said that Marquita’s story at
the time of the interview agreed with Brittany’s and that he had recorded the
conversation on a seventy-minute video.

            During
cross-examination, Detective January was asked if he had been told by a woman
named Stacey that a man named Darrell High (known as Fifth Ward) had told her
he was with Raheem that night.  Detective January said that the woman had
spoken to another officer but that he had tried to contact her.  Detective
January then testified that Stacey was a documented prostitute in Waco and that
High was her pimp and had three or four prostitutes working for him.  One of
them gave Detective January information as to a motive Stacey had for trying to
have High implicated in the murder:  Stacey owed High money.

            Detective
January acknowledged that Jeremy Standifer had sent a letter to the federal
prosecutor concerning what Brittany had said to him.  Contrary to Brittany’s
memory, Detective January said he contacted Jeremy about a week before he
impounded Brittany’s car.  He was aware that Jeremy might be using the
information to try and reduce his federal sentence, but he had not made any
request to the federal prosecutor and did not know whether Jeremy helped
himself or not.

            Detective
January testified in summary that he found what Jeremy told him to be credible
and that his statement and the statements from Brittany, Marquita, and Raheem
all agreed.

            Appellant
did not present any evidence.  In appellant’s opening statement, he had conceded
that the victim had been murdered, but he asserted that he was not at the
victim’s house that night.  He suggested that appellant had broken his
relationship with Brittany and that her testimony would be from a bitter and
scorned woman.  Appellant’s closing argument attacked the credibility of
Brittany, suggesting that she and Jeremy tried to frame appellant to help Jeremy
obtain a reduction on his federal prison sentence.  Appellant referred to
testimony by Brittany where she said that she and Jeremy were at one time
planning to be married and insisted that Jeremy was central to this case.  Appellant
also suggested that Detective January was overworked and that he did not
sufficiently investigate the possibility that Fifth Ward was with Raheem that
night.

            The
jury rejected appellant’s argument and found him guilty of capital murder.

Standard
of Review

            We
will review the sufficiency of the evidence under the currently applicable
legal sufficiency standard of review.  See Brooks v. State, 323 S.W.3d
893, 912 (Tex. Crim. App. 2010).  

            The
standard of review for an appellate court in evaluating the legal sufficiency
of the evidence is to determine whether any rational finder of fact could have
found the existence of the elements of the offense beyond a reasonable doubt after
viewing all of the evidence in a light most favorable to the verdict.  Jackson
v. Virginia, 443 U.S. 307, 319 (1979).  The appellate court’s duty is not
to sit as a thirteenth juror reweighing the evidence or deciding whether it
believes the evidence established the elements in question beyond a reasonable
doubt.  Blankenship v. State, 780 S.W.2d 198, 206–07 (Tex. Crim. App.
1988).

            Under
the above standards, all evidence, including circumstantial evidence, is
considered.  Nguyen v. State, 54 S.W.3d 49, 52 (Tex. App.—Texarkana 2001,
pet. ref’d).  Circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor, and circumstantial evidence can be
sufficient to establish guilt.  Hooper v. State, 214 S.W.3d 9, 13 (Tex.
Crim. App. 2007).  The legal sufficiency test must be applied to the
application paragraph in a hypothetically correct jury charge.  Fuller v.
State, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002); Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997). 

Analysis

            In appellant’s
first two issues, he challenges the sufficiency of the evidence to establish
that appellant committed capital murder, specifically that the evidence was
insufficient to show that he intended to commit a robbery, and to establish
that appellant intended to cause the death of the victim.

            In
Texas, a person commits the offense of capital murder when he intentionally
causes the death of an individual during the course of committing or attempting
to commit robbery. Tex. Penal Code Ann.
§ 19.03(a)(2) (West Supp. 2011).  Section 29.02 provides that a person
commits a robbery if, in the course of committing theft, and with the intent to
obtain or maintain control of property, he intentionally, knowingly, or
recklessly causes bodily injury to another.  Id. § 29.02 (West 2011).  Under
the law of parties in Section 7.01(a), a person may be convicted as a party to
an offense if the offense is committed by his own conduct, by the conduct of
another for which he is criminally responsible, or both.  Id. §
7.01(a).  Under Section 7.02(b), a person may be found guilty of capital murder
as a party if the following conditions are met:

            If, in
the attempt to carry out a conspiracy to commit one felony, another felony is
committed by one of the conspirators, all conspirators are guilty of the felony
actually committed, though having no intent to commit it, if the offense was
committed in furtherance of the unlawful purpose and was one that should have
been anticipated as a result of the carrying out of the conspiracy.

 

Id. §
7.02(b).  Thus, if the evidence is sufficient to support appellant’s conviction
as a party, we must uphold the conviction.

            Brittany
testified that, during the evening before the murder, she saw Raheem with a
long, black rifle and appellant with a silver and black handgun.  She also
found a box of long bullets in the trunk of her car.  While Brittany was with
them within a week or two of the murder, appellant and Raheem had said they
needed to “hit a lick” and, as they were driving by the victim’s house, discussed
there being marihuana and money at the victim’s residence.  She was with them
in her car on at least two occasions when the remarks were made.  In taking weapons
with them to the victim’s house, Raheem and appellant should have anticipated
the result that occurred.  

            Brittany
testified that appellant was wearing dark-colored clothing when he left
Pudding’s house with Raheem but that he had changed when she next saw him at
Marquita’s car.  He later took the dark-colored clothing out of her car trunk
when she dropped him off at his aunt’s house.  

            When
appellant came up alone to where Marquita’s car had broken down, appellant
appeared worried.  Appellant first had an emotional talk with his sister and
then told Brittany that Raheem was hiding but needed some pills for pain
because he had been shot in the foot.  Later, at the Dallas hospital, appellant
told Brittany how they had cut the power to the victim’s house and laid in wait
for him and how Raheem got shot in the foot during a struggle over the weapon. 
Brittany described her reaction at that point to the jury:  they must have been
trying to rob the man.  Brittany voiced her worry that she might be implicated,
but appellant assured her that he had parked her car around the corner.  When
the police came to impound her car, she knew why they had come.

            Detective
January testified that the statements he had taken from Brittany, Marquita, and
Raheem all agreed.  Marquita told him that appellant left Waco when Brittany’s
car was im-pounded in October 2008.  Marquita’s testimony at trial, quoted earlier,
was also that appellant told her then that he was leaving because he was about
to be arrested “for what Raheem is going down for.”  Dallas police officers
arrested him in February 2009.  He gave them a false name, but after his arrest
for marihuana possession, they learned his correct name and that there was an
arrest warrant for him for murder.

            The
evidence was legally sufficient for the jury to draw the same inference that
Brittany had:  Raheem and appellant had planned to rob the victim and went
there that night to carry out their plan.  

            Because
of the law of parties, the State had only to prove that either Raheem or appellant,
in firing the fatal shots, had the intent to murder the victim.  Intentional
murder is a “result of conduct” offense.  Martinez v. State, 763 S.W.2d
413, 419 (Tex. Crim. App. 1988); Ybarra v. State, 890 S.W.2d 98, 106 (Tex.
App.—San Antonio 1994, pet. ref’d).  Although there apparently was a struggle
between the victim and his assailants, there was evidence that showed his death
was not unintentional.

            The
victim’s son, Jameson, testified that, as he looked through the back-door
screen, he saw flashes of light from a semiautomatic weapon that was near the
back of the beauty shop, some distance from where the victim was found at the
corner of their house.  Officer Carpenter testified that the .223 casings were
found approximately four or five feet from where the victim lay.  Their testimony
suggests that the shots were intentionally fired at the victim after a
struggle.

            The
medical examiner, Dr. Dyer, testified that there were four gunshot wounds in the
victim’s body.  Three were sharply downward in their angle; the fourth shot
came out the lateral backside of the right thigh.  The victim had soot on his
left forearm, indicating that his arm got in the way of a gunshot.  In addition
to the four gunshot wounds in the victim, there was a .45 caliber slug lodged
in the corner of the house, indicating that the person firing the .45 caliber weapon
was aiming at the victim.  Dr. Dyer testified that, looking at the entrance
wounds, he could not tell the caliber of the gunshots; therefore, the wounds
may have been from either weapon.

            Although
the victim’s body had four gunshot wounds, the wall near him had a bullet, and
Raheem’s foot received a gunshot wound, only three .223 casings and one .45
casing were found.  At least six shots were fired that night.  From the angle
of the gunshot wounds, the number of the shots fired, and Jameson’s and Officer
Carpenter’s testimony as to where some of the shots were fired from, the evidence
was sufficient to support the jury’s conclusion that the murder of the victim
was intentional.  Appellant’s first two issues are overruled.

            In appellant’s
third issue, he contends that the trial court committed reversible error in
submitting instructions in the abstract portion of the charge that allowed the
jury to convict appellant if he intentionally or knowingly engaged in conduct
that resulted in the death of the victim instead of requiring the jury to find
that appellant had the specific intent to cause the victim’s death.  In its
charge, the trial court defined intentionally and knowingly as follows:

            A person
acts intentionally, or with intent, with respect to the nature of his conduct,
or to a result of his conduct, when it is his conscious objective or desire to
engage in the conduct or cause the result.

 

            A person
acts knowingly, or with knowledge, with respect to the nature of his conduct,
or to circumstances surrounding his conduct, or to a result of his conduct, when
he is aware of the nature of his conduct or that the circumstances exist.  A
person acts knowingly, or with knowledge, with respect to a result of his conduct
when he is aware that his conduct is reasonably certain to cause the result.

 

            Appellate
review of alleged error in a jury charge involves a two-step process.  Abdnor
v. State, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994).  Initially, we
must determine whether error occurred; if so, we must then evaluate whether
sufficient harm resulted from the error to require reversal.  If there is error
in the court’s charge but appellant did not object to it at trial, we must
decide if egregious harm has occurred, i.e., whether the error caused such harm
that appellant did not have a fair and impartial trial.  Tex. Code Crim. Proc. Ann. art. 36.19
(Vernon 2006); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1985).  Appellant did not object to the charge in this case.

            In Cook
v. State, 884 S.W.2d 485 (Tex. Crim. App. 1994), the court held that it was
error for the trial court not to limit the definitions of the culpable mental
states even in the abstract portion of the court’s charge.  The defendant in Cook
was charged with intentional murder pursuant to Section 19.02(a)(1) and was
convicted by a jury of the lesser included offense of voluntary manslaughter. 
The defendant objected to the charge at trial because the definitions of
intentionally and knowingly were not limited to the result of defendant’s
conduct.  The Court of Criminal Appeals agreed and reversed and remanded the
case. In his concurring opinion, Judge Maloney observed that understanding
“conduct elements” made sense only in the context of an “element analysis”
rather than an “offense analysis.”  He agreed that in the case of a “result of
conduct offense,” such as murder, the definition of “intentionally and
knowingly” must be limited to the result of conduct language.  But Judge
Maloney pointed out that problems may arise because not all offenses are
characterized by a single conduct element.  He specifically mentioned that
capital murder is usually a combination of offenses (e.g., intentional murder
plus robbery).

            The
problem in this case is that it was a capital murder case that involved
intentional murder plus an attempt to commit robbery.  It also involved the law
of parties.  Because of the robbery aspect, the trial court gave the broader
definitions of intentionally and knowingly, and the court also defined
reckless.   The charge defined when a person is criminally responsible as a
party to an offense.  As the court of appeals explained in Wood v. State,
4 S.W.3d 85 (Tex. App.—Fort Worth 1999, pet. ref’d), a party may be held criminally
responsible for the acts of another under Section 7.02(b) even though that
party did not intend for the act to occur as a result of his conduct.

            We will
assume, without deciding, that the trial court erred in its charge because we
find that no egregious harm occurred even if there was error.  When conducting
a harm analysis, the reviewing court looks at (1) the entire jury charge; (2)
the state of the evidence, including contested issues and the weight of the
probative evidence; (3) arguments of counsel; and (4) any other relevant
information revealed by the record of the trial as a whole.  Bailey v. State,
867 S.W.2d 42 (Tex. Crim. App. 1993); Ybarra, 890 S.W.2d at 106.

            The
second and third paragraphs of the trial court’s charge stated that “a person
commits the offense of Murder when he intentionally or knowingly causes the
death of an individual” and a “person commits Capital Murder when such person
intentionally commits the murder in the course of committing or attempting to commit
the offense of robbery.”  The trial court then defined the elements of robbery,
which included an “intent to obtain or maintain control of property” and
“intentionally, knowingly, or recklessly caus[ing] bodily injury to another.” 
The trial court also correctly instructed the jury on the law of parties.

            In the
opening statement and closing argument of appellant’s counsel, he recognized
that the victim had been murdered.  Appellant’s defense was that he was not
present at the victim’s residence that night and that there was no physical
evidence that he was.  Instead, defense counsel attacked Brittany’s credibility
and suggested that Jeremy and Brittany wanted to frame appellant to help Jeremy
reduce his sentence.  Appellant’s theory was that Fifth Ward was the person
with Raheem that night but that Detective January had insufficient time to
pursue that lead.  The jury rejected appellant’s argument and believed
Brittany’s testimony, which was buttressed by the testimony of other State
witnesses and the forensic evidence.  Even if the trial court erred in its
charge, we find there was no reversible error under the criteria of Almanza. 
Appellant’s third issue is overruled.

            As
stated at the outset, the State has conceded appellant’s fourth issue.

This
Court’s Ruling

            The
trial court’s judgment is modified to delete the assessment of costs of counsel
against appellant.  As modified, the trial court’s judgment is affirmed.

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

December 22,
2011

Do not publish. 
See Tex. R. App. P.
47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Kalenak, J.









[1]The bullet was found in January 2010 by workmen working
on leveling the victim’s house.  It was lodged in the wall at the corner near
where the victim lay.